Thank you, Your Honor. I think that this case is about category of fruits of law enforcement exploitation. And basically on September 20, 2002, Thomas McDonald was in custody in a prison down in California. A law enforcement officer went and interrogated him without giving him a memoranda warning, during which time he essentially admitted to a drug trafficking crime in the state of Montana. The court gave us recently an order indicating that we should be prepared to discuss three cases. The Patani case, Michigan v. Tucker, and Oregon v. Elstad.  It may be that some of the focus in the district court was on, are these fruits or are they attenuated, you know? Could these witnesses have identified him, they hadn't been shown the photo, and so on? Yes. And did they show him the photo as a result of the unmerandized statement? But these cases may raise the issue whether the U.S. Supreme Court has simply held that we're not concerned about fruits of a Miranda violation. In any event, I think that's an issue that we need to look at before we get to the question of whether there was independent source or whatever. Yes, and I agree, Your Honor. That's why I say that I think that the category of fruit is important here. For example, in the Oregon-Elstad case, it was a burglary, and the fruit that was deemed to be admissible, notwithstanding an unwarned statement, was the defendant's prior statement. So that's the category of No, I don't think that's correct. I think what happened was he didn't get a Miranda warning when he gave his first confession. Then he got a Miranda warning. Then he did give a second confession, but the question was, would he have given a second confession had he known that the first confession was not – was inadmissible and was a failure of Miranda by telling him the first confession is inadmissible. Right. And the way I read that, they overruled the Oregon Court of Appeals and stated that the second fruit, that is, the second confession, was voluntary and uncoerced, and he had been given his warnings. Therefore, it was admissible. And the failure to warn him that the first one couldn't come in for whatever coercive effect he might have, that may have happened, was not a violation of the Constitution. That's exactly right. And so then, in the Tucker case, it was a rape case, and in essence, in that case, the defendant – actually, a dog showed up at this house, and somebody – I think a neighbor followed the dog to another house, and that implicated the defendant. And law enforcement went to that particular house and saw the defendant there and questioned him. And he provided an alibi witness. He said, this – I was at this other guy's house named Henderson, and then I went to sleep. And therefore, I wasn't there at the time of the rape. That was the famous dog that didn't bark? I think so, yes, Your Honor. The dog hadn't been Mirandized. The dog did not. But I'm – with Petan, it seems to me we don't concern ourselves with the fruits of a un-Mirandized statement if the statement was voluntary. Well, I think that the distinction with Petan, as to this case, is that the witness was an alibi witness. In other words, he says, I wasn't there, I was with this other guy. And so law enforcement, rightfully so, went and interviewed that other witness, who said, no, he had left much earlier. The distinction is that here we have – here the fruit is basically a self-incriminatory statement that would not have led law – that but for its having been made, law enforcement would not have been led to inquire or question these other witnesses in the drug conspiracy about Mr. McDonald. And I think that's why it's significant. In Petani, we have an article of evidence. In essence, the – It's the same thing. If we hadn't taken the statement, which we got by violating Miranda, we wouldn't have gotten to that piece of evidence. But the Supreme Court said, well, we don't care. Well, I don't think that's correct, because it seems to me that in Petani, one of the law enforcement officers knew that the guy had a firearm. And so there was some preexisting knowledge that he unlawfully possessed this firearm. And then they went and questioned him about that. And they seized the firearm. He admitted that he had it, allowed them to retrieve it, and then they seized it. And that was an article of evidence. And in this case, in our McDonald case, what we have is law enforcement had, in essence, no information that Mr. McDonald was involved in drug trafficking. The only thing that they had was a suspicion that he might be based upon his car that they had found at the airport, and the fact that the car had a great number of miles on it. And I think the other thing was that he was from Red Bluff, California. That's the only thing that they had. Otherwise, it was just pure speculation and pure suspicion. Didn't one of the witnesses say there was a Tom involved? Yes. So there was a Tom McDonald. Pardon me? Not Tom McDonald. Right. No, Dopey and Tom. Right. And then when shown the photographs, he said, that's the one. That's the one. That one was Seymour. Yes. Seymour named Sangree and McDonald. Right. That goes to the independent thing, the three cases which you've discussed. And so the point is that but for Mr. McDonald's self-incriminating statement that was taken without his Miranda warnings, law enforcement would not have had any information that he was involved in this. Did the district court make a finding of any kind regarding whether, without the statement, they never would have asked about him? Your Honor, I think that the important thing is that the district court, and this is, the finding is in the transcript. And it's basically toward the end of his finding. And he says, in substance, this is what I find. And he stated that, in substance, I find that law enforcement was in the early stages of its investigation, but I think that they would have found Mr. McDonald, nonetheless. So he doesn't, so it's sort of an inevitable discovery and he doesn't have to worry about. Yes. And that's why, that's why I think that the nature of the fruit between the McDonald case here and the Tucker case and the Elstad case and the Patel case is significant. Because the self, the compelled self-incriminatory statement is the very fruit that is protected by the Fifth Amendment, self-incrimination clause. So you're saying that, notwithstanding these cases, some fruits of a Miranda violation are still excludable under Wong-Sung? Absolutely. And this is the case. But you're not requiring that the Miranda violation have, that there be at that time an involuntary statement? An involuntary incriminating statement. Yes. And I think that if there's a Miranda violation in a certain type of fruit, as in this case, then it should be, still be excluded under Wong-Sung. Yes. I'm saying that. And the reason I'm saying that is because there's a presumption of coercion. He was in jail. And the fruit was the self-incriminatory statement, which ultimately led law enforcement to him in this drug conspiracy. And what's your best case for that proposition? Wong-Sung. No, it's Patani and the dissent. It's Justice Souter, Justice Ginsburg, and I think else. Well, Wong-Sung wasn't applied in Patani, and they said so. So what you're saying is your best case is the dissent in Patani? And Hubbell. They cite in the dissent the Hubbell case. Mr. Roussel would like our panel to write the opinion that's the best case for this proposition. What's the best case you have for the presumption of coercion when you question a prisoner? Miranda itself. I think that that's where, I think that's where the presumption occurs. And that's where it's stated. Okay. Thank you very much, sir. All right. We will hear from Ms. Lori Sook. Thank you, Your Honor. I just want to make sure you can still hear us. We can certainly hear you. I can hear you, Your Honor. Thank you. Please go ahead. To introduce myself for the record, I'm Lori Sook, an assistant U.S. attorney in Montana, arguing from Montana today. The three cases that the court has asked us to address in the view of the United States really do have to be answered before we even get to the issues that the district court and the defendant and the government fleshed out in the district court. These three cases set forth the fundamental difference between the Fourth Amendment and the Fifth Amendment. The fundamental difference being that the Fourth Amendment and violations of that amendment are constitutional violations, and the Wong Sun Doctrine, the fruit of the poisonous tree doctrine, applies broadly. The Fifth Amendment, and specifically Miranda, which is actually, as the courts have stated, not constitutional, even though Dickerson is there, but a broader protection of the compulsion rights set forth in the Fifth Amendment, is different in that it's prophylactic. And, therefore, the Wong Sun Doctrine does not apply and was not applied in these three cases. The first case, Michigan v. Tucker, interestingly enough, is the case that is really factually on point to this case, because it was a situation where the respondent, it was in a habeas context, was in custody, was not Mirandized. The procedural issues of Michigan are interesting in that at the time that he was questioned, Miranda wasn't in place. At the time Michigan was decided, it was. He was only, the only protection really in place to the officers was the right to counsel. But in any event, he was not given his Miranda warnings, and in that provided a witness that the government used against the respondent. This case does not differ except that Miranda was in place for a long time prior to this unwarned statement taken by, from Mr. McDonnell, and it wasn't just one witness, it was a number of witnesses that we used. Only one, though, discussed by Mr. McDonnell in his unwarned statement. The court, all of these courts, Tucker, Elstad, and Patani, discussed this fundamental difference. The differences in the cases is just what the, the appellants were trying to suppress. Be it a witness statement in Michigan, another statement of the defendant after warning in Elstad, or a piece of physical evidence in Patani. These cases, in the view of the United States, answer the question and govern this case. If the court were to get to the issues that were addressed by the district court and raised by the defendant and answered by the government, the court made its findings. They weren't in any way clearly error as to how the government could have presented this case, the timing that it had in the investigation. One question raised by, I believe, Judge Canby was this. Do you have to have, or what you're saying is, does it just have to be a Miranda violation or does it have to be an involuntary confession? And that is actually the only issue, because a Miranda violation in and of itself is not involuntary. It's not, to not warn pursuant to Miranda is not a constitutional violation. Do we know from the record here much about the circumstances of this interview in the prison? No, we do not, Your Honor, because unfortunately this issue was not flushed out in the district court. I can tell the court the three citations to the record that even talk about it. And it is at the excerpt of record page three where the district court was simply reiterating the motion of the defendant in setting the scene for the evidentiary hearing that we had and said, as I understand the thrust of the defendant's position, it is that the defendant's statements were obtained in an interrogation or an interview that did not include a Miranda warning and therefore the statements were not voluntary. That's what the court said. It also addressed the assertion by the defendant that he was expressly or impliedly told that the information would never be used against him. It was a statement, no finding by the court. In testimony, the only elicited testimony by the government is on page eight of the record.  statement that the defendant's statement was obtained by me. Is Mr. Sturdy or Detective Sturdy, that's the individual in California that took the unwarranted statement, the individual who obtained the statement from the defendant on September 20th of 2002? Yes, it is. And is this a statement in which Mr. Sturdy failed to advise the defendant of his Miranda rights? Yes. That's it. No more discussion. And finally, the only other reference that we believe is of relevance to the question is, in fact, in the judge's findings at page 50 where he said he restated the government's acknowledgment of the circumstances of the interview of September 20, 2002, and that no Miranda warnings were provided to the defendant, McDonald, prior to the commencement of that interview, I accept on faith that the government will make no attempt during its case-in-chief to introduce evidence, et cetera. Are you clear on that, Ms. Sook? And I answered, yes, Your Honor. And then he said, Judge Haddon, that is, that matter will, any issue related to that interview will become a matter for further consideration by this court only if the defendant testifies. And I will reserve until the time of trial and until such time as the defendant testifies whether or not any statements given by him were voluntary, as apart from having been given without compliance with the required Miranda warning. The defendant never testified, Your Honor. The issue was never addressed by the district court. In this case, the record tells us that there is only a violation of Miranda voluntariness defined by the Supreme Court and by this circuit in Juanita. It's a totality of the circumstances test where you have to overbear the will of the defendant. We have no findings regarding that. Whose burden is it? But it's the government's burden, Your Honor. In this case, we do believe that the court is correct, that these cases answer the question. Because what we addressed in the district court comes after the fact. And those findings stand as they are. We don't believe Judge Haddon clearly erred. We would ask the court to find that there was not an involuntary statement. The only allegation here is a Miranda violation. These cases are clear that that is not enough to set forth to make a statement involuntary simply in violation of Miranda. Well, no. But if the government's – if we don't know what the circumstances of the interrogation were, we don't know that it's voluntary. And if the government has the burden, then maybe you have to assume for purposes of decision that it's an involuntary statement, in which case all of the things that the district court went through make sense. In other words, would this have been – all this stuff been discovered anyway and so on? But I don't know how we can make a finding – I'm speaking for myself only. I haven't talked to my colleagues. But I don't know how we can make a finding that this was a voluntary statement when we don't know anything about the circumstances of it, except that the man was in prison. I understand – except that the man was in custody, Your Honor. I understand. Your task, as you set it forth, is the government absolutely agrees. If you did assume involuntariness in this situation, then Mr. Huvestal's argument might have some appeal. Without case law to support it, it certainly is a situation where you have an involuntary confession, and that would be something different. A constitutional violation where arguably Wong-Sun would apply, and then you would go and look to what the district court found here and as to whether the court was correct in deeming our witnesses not the result of this statement by the defendants. Well, maybe we'll give you a little extra time to argue and we'll let Mr. Huvestal address that issue a bit more if we assume for a minute that the case is just back on the district court's issues. But let's just say we assume it's involuntary, and could you at least take two minutes and explain why it is you believe these other statements would have been discovered or why they weren't really proofs of the confession? Thank you, Your Honor. I'm assuming you're talking to me. Is that correct, Your Honor? Yes, thank you. I'm addressing this to Ms. Suk first, but then later we'll hear from you. This is actually one issue that the government did address in its brief and is addressed in the excerpts of record, the reasoning as to how we would have found these witnesses whether we received the statement from Mr. McDonald. As the court found, really only one witness that the government called at trial, Shane Nault, was discussed by the defendant in his statement. None of the other witnesses were brought up by Mr. McDonald. We have set forth in our factual summary, which tracks the findings of the district court, and the testimony of Deputy Fedderspiel, who was the investigating agent, why he would have followed the same path that he ultimately took. The government concedes that the investigation was at its inception. We do not concede that that inception, namely that there was a rental car with inordinate mileage in Mr. McDonald's name and the fact that he was from the Red Bluff, California area, was just something that Deputy Fedderspiel couldn't base an investigation upon. He had investigated two other individuals from Red Bluff, California that had been convicted of conspiracy to distribute methamphetamine in federal court right around this time. So that raised suspicion in this drug cop's mind that someone in our area of Montana, Montana in general, with a rental car with inordinate mileage from Red Bluff, California, might have reasonable suspicion to believe that he was bringing up drugs. He took that evidence and actually contacted Detective Sturdy, but every other person aside from Shane Nault, we would have reached because we didn't get the identity of those individuals from Mr. McDonald. And even considering Shane Nault, there was a search done of Mr. Nault's residence prior to the interview of Mr. McDonald. That interview occurred in September 20th of 2002, and that search was conducted in 2001 and resulted in the seizure of methamphetamine. And other witnesses other than McDonald had provided information about purchasing methamphetamine from Nault. These same witnesses. Thus, without the benefit of the information that we got from McDonald, we still would have even gotten to Nault. Those are the facts that the court found after a fairly extensive evidentiary hearing where the court was able to parse out what Deputy Federspiel said and also his demeanor. Under extensive cross-examination from Mr. Movistol, the court made its findings. It's in the best place to make those findings, and it did not clearly err when it did so. Okay. Thank you. Mr. Movistol, you may have a rebuttal point on the first part of your argument. Okay. But apart from that, assuming that either under your theory you've advanced today or under some other theory, we end up applying one, son. And what's your argument as to how the district court erred? Okay, Your Honor. I've got your brief. I've obviously got your brief. But I thought we would give you two or three minutes to speak again. As an initial matter, the record, the location of the record, Your Honor, is in excerpt of record. It's the district court's finding. It's excerpt to record 5. It's on page 56. And this is what the district court found beginning at line 3 no, line 2. It is my determination from this record that the officers did not rely on statements obtained from Mr. McDonald to get the information from these witnesses who have been identified by the government as those to be tendered in this trial. That is clearly erroneous, because they had the photograph and they showed the witnesses the photograph. So that finding was found. They didn't get the photograph from McDonald. No, but they got the admission. Let's talk about the witnesses one by one. Okay. Seymour was asked about Nault and Strike and where Nault and Strike got their dope methamphetamine. He said McDonald. Sangre was asked about where he got his supplies. And that was from McDonald and Ogburn, Dopey and Tom. So neither Sangre nor Seymour were identified by McDonald, nor were they identified by Nault. But I think that what's critical about that is that prior to those identifications, the law enforcement officer took the photograph and showed it to him, and then they made the identification. Then they said, that's the guy that did it. And I think the record is the evidence that before they went to interview Sangre or Seymour, or at the beginning of the interview, before the middlemen were discussed by Seymour, that is, Nault and Strike, and by Sangre, Ogburn, and McDonald, they showed them the photographs. If I might have just a moment here. Prior to the recorded interview of Seymour, Agent Fedderspiel showed Seymour a picture of McDonald. So that's prior to the recorded interview. In other words, before he turned the tape recorder on. And that's located at page 10, line 21, to page 12, line 21 of the hearing. And then page 32, line 7, to page 36, line 25. But you already talked about what Seymour knew. And when he started recording it, then he showed, before he started recording it. But is there any indication that he showed the photograph of McDonald to Seymour before he started finding out where Seymour got his stuff from Nault and Strike? I don't think so, Your Honor. And in rebuttal, with respect to the location in the record of what occurred, that's the report that Agent Sturdy drafted is, as a result of the interview, is at Excerpt to Record 3. It doesn't talk about the circumstances of the interview or the interrogation, but it does talk about the self-incriminatory aspect of it. Finally, I think Tucker can be distinguished, again, because the witness in Tucker was an exculpatory witness, whereas in this case, the fruit that was exploited by law enforcement is the very thing that the Fifth Amendment protects. That is compelled self-incrimination. Well, in Tucker, the witness started out being exculpatory, according to Tucker. But when he got to Henderson, he said, uh-uh, I'm going to give him the alibis. So he was an inculpatory witness. Ultimately, but the statement here is the incriminatory statement. And I think that's a significant distinction. Thank you. Very good. Well, we thank Mr. Huchstall and Ms. Suk.
judges: Canby, Gould, Bea